JUDGE KATHLEEN CARDONE

FILED

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

2023 MAR -3  PM 5: 28

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
                    DEPUTY

| | |
|---|---|
| **ERIK SALAIZ,** | § |
| | § |
| **Plaintiff,** | § |
| | § |
| v. | § |
| | § |
| **AFFORDABLE INSURANCE GROUP INC,** a | § |
| Florida Corporation | § |
| | § |
| | § |
| | § |
| | § |
| **Defendants.** | § |
| | § |

EP23CV0095

## PLAINTIFF'S ORIGINAL COMPLAINT

### PARTIES

1.      The Plaintiff is ERIK SALAIZ ("Plaintiff") a natural person, resident of the Western

District of Texas, and was present in Texas for all calls, in this case in El Paso County, Texas.

2.      Defendant AFFORDABLE INSURANCE GROUP INC ("AIG" "Defendant") is a

corporation organized and existing under the laws of Florida and can be served via registered

agent Andrew T Shader at 820 NE 5th Terrace, Fort Lauderdale, Florida 33304.

### JURISDICTION AND VENUE

3.      Jurisdiction.  This Court has federal-question subject matter jurisdiction over Plaintiff's

TCPA claims pursuant to 28 U.S.C. § 1331 because the TCPA is a federal statute. *Mims v. Arrow*

*Fin. Servs., LLC*, 565 U.S. 368, 372 (2012). Defendants' telemarketing robocalls to Plaintiff;

adds little complexity to the case.

4.      Personal Jurisdiction.  This Court has general personal jurisdiction over the defendant

1

because they have repeatedly placed calls to Texas residents, and derive revenue from Texas residents, and they sell goods and services to Texas residents, including the Plaintiff.

5.      Venue.  Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1)-(2) because a substantial part of the events giving rise to the claims—the calls and sale of goods and services directed at Texas residents, including the Plaintiff—occurred in this District and because the Plaintiff resides in this District.  Residing in the Western District of Texas when he received a substantial if not every single call from the Defendant that are the subject matter of this lawsuit.

6.      This Court has venue over the Defendant because the calls at issue were sent from and/or on behalf of the above-named Defendant to the Plaintiff, a Texas resident.

## THE TELEPHONE CONSUMER PROTECTION ACT
## OF 1991, 47 U.S.C. § 227

7.      In 1991, Congress enacted the TCPA to restrict the use of sophisticated telemarketing equipment that could target millions of consumers *en masse*.  Congress found that these calls were not only a nuisance and an invasion of privacy to consumers specifically but were also a threat to interstate commerce generally.  *See* S. Rep. No. 102-178, at 2-3 (1991), as reprinted in 1991 U.S.C.C.A.N. 1968, 1969-71.

8.      The TCPA makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice … to any telephone number assigned to a … cellular telephone service." 47 U.S.C. § 227(b)(1)(A)(iii).

9.      The TCPA makes it unlawful "to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is initiated for emergency purposes, is made solely

2

pursuant to the collection of a debt owed to or guaranteed by the United States or is exempted by rule or order" of the Federal Communication Commission ("FCC"). 47 U.S.C. § 227(b)(1)(B).

10.     The TCPA provides a private cause of action to persons who receive calls in violation of § 227(b). 47 U.S.C. § 227(b)(3).

11.     Separately, the TCPA bans telemarketing calls without a do-not-call policy available upon demand. 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(d)(1).[1]

12.     The TCPA provides a private cause of action to persons who receive calls in violation of § 227(c) or a regulation promulgated thereunder. 47 U.S.C. § 227(c)(5).

13.     According to findings of the FCC, the agency vested by Congress with authority to issue regulations implementing the TCPA, automated or prerecorded telephone calls are a greater nuisance and invasion of privacy than live solicitation calls and can be costly and inconvenient.

14.     The FCC also recognizes that "wireless customers are charged for incoming calls whether they pay in advance or after the minutes are used." *In re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 FCC Rcd. 14014, 14115 ¶ 165 (2003).

15.     The FCC requires "prior express written consent" for all autodialed or prerecorded telemarketing robocalls to wireless numbers and residential lines. In particular:[A] consumer's written consent to receive telemarketing robocalls must be signed and be sufficient to show that the consumer: (1) received clear and conspicuous disclosure of the consequences of providing the requested consent, *i.e.*, that the consumer will receive future calls that deliver prerecorded messages by or on behalf of a specific seller; and (2) having received this information, agrees unambiguously to receive such calls at a telephone number the consumer designates. In addition,

---

[1] *See* Code of Federal Regulations, Title 47, Parts 40 to 60, at 425 (2017) (codifying a June 26, 2003 FCC order).

the written agreement must be obtained without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service.

16.     *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 FCC Rcd. 1830, 1844 ¶ 33 (2012) (footnote and internal quotation marks omitted). FCC regulations "generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In the Matter of Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 10 FCC Rcd. 12391, 12397 ¶ 13 (1995).

17.     The FCC confirmed this principle in 2013, when it explained that "a seller … may be held vicariously liable under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers." *In the Matter of the Joint Petition Filed by Dish Network, LLC*, 28 FCC Rcd. 6574, 6574 ¶ 1 (2013).

18.     Under the TCPA, a text message is a call. *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 951 – 52 (9th Cir. 2009).

19.     A corporate officer involved in the telemarketing at issue may be personally liable under the TCPA. *E.g.*, *Jackson Five Star Catering, Inc. v. Beason*, Case No. 10-10010, 2013 U.S. Dist. LEXIS 159985, at *10 (E.D. Mich. Nov. 8, 2013) ("[M]any courts have held that corporate actors can be individually liable for violating the TCPA where they had direct, personal participation in or personally authorized the conduct found to have violated the statute." (internal quotation marks omitted)); *Maryland v. Universal Elections*, 787 F. Supp. 2d 408, 415 – 16 (D. Md. 2011) ("If an individual acting on behalf of a corporation could avoid individual liability, the TCPA would lose much of its force.").

## FACTUAL ALLEGATIONS

20.     Plaintiff successfully registered his personal cell phone (XXX) XXX-9280 on the

National Do-Not-Call Registry May 31, 2021, which was more than 31 days prior to receiving the alleged calls.

21.     Plaintiff never asked the National Do-Not-Call Registry administrator to remove him from the National Do-Not-Call Registry and Plaintiff was on the National Do-Not-Call Registry at all times relevant to this Complaint.

22.     Defendant AIG is an insurance broker that sells Medicare plans to consumers with Medicare. *See Exhibit A.*

23.     Defendant AIG is owned and controlled by Andrew T Shader.

24.     As part of their marketing, Defendant AIG hires and authorizes telemarketers to make unauthorized phone calls to thousands of consumers *en masse* using an automatic telephone dialing system ("ATDS") to solicit additional Medicare products on behalf of Defendant AIG.

25.     Defendant AIG approves of the contracts with the telemarketers.

26.     Defendant AIG authorizes the payments to the telemarketers.

27.     Defendant AIG pays the telemarketers out of bank accounts they own and control.

28.     Plaintiff has never had any relationship with Defendant AIG or has ever been a customer of Defendant AIG.

29.     Defendant AIG has been sued prior to this lawsuit for violating the TCPA Farmer v. Affordable Insurance Group Inc., No. 0:23-cv-60042-RNS (S.D.FL., Jan. 10, 2023) and continue their illegal behavior because violating the TCPA benefits Defendant AIG financially.

30.     Defendant AIG's website they own and control is https://www.aighealthins.com.

31.     Plaintiff received at least seven (7) unauthorized phone calls to his personal cell phone 9280 within a seventy-two-hour period from telemarketers/representatives calling on behalf of and/or from Defendant AIG soliciting Medicare supplement plans ("the calls").

32.    The calls 1-3 Plaintiff received from telemarketers calling on behalf of Defendant AIG we're not made to Plaintiff directly and could have reached anyone in the United States confirming these calls were generated by an ATDS.

33.    The ATDS used to make the calls 1-3 had the capacity to store and produce telephone numbers using a random or sequential number generator.

34.    With information and belief Plaintiff has received more calls from telemarketers calling on behalf of Defendant AIG within the past two years that are unknown to Plaintiff at this time but will be revealed during discovery.

35.    On April 26, 2022, at 3:15PM Plaintiff received one of multiple unauthorized calls to his personal cell phone 9280 from a telemarketer named Jewels calling on behalf of Defendant AIG from phone number (915) 933-8328.

36.    Plaintiff answered and there was a 3-4 second delay followed by an audible beep before being connected to Jewels.

37.    This was the third call Plaintiff received from Jewels within two days.

38.    Jewels never identified the company she was calling on behalf of in any of the three calls.

39.    Defendant AIG trains their telemarketers not to reveal who they are calling on behalf of in order to duck liability from violating the TCPA.

40.    Jewels advised Plaintiff that this call was regarding an affordable Medicare supplement and asked Plaintiff if he had Medicare coverage.

41.    Jewels then advised Plaintiff her job is to ask a few simple questions regarding additional Medicare coverage.

42.    Jewels then asked plaintiff qualifying questions for additional Medicare coverage on behalf of Defendant AIG.

43.    Jewels asked Plaintiff if he could afford a monthly payment of $130 that would provide 100 percent hospital coverage.

44.    Plaintiff was extremely aggravated and annoyed for continuing to receive the same calls from Jewels soliciting "affordable Medicare supplement" plans and advised Jewels he was interested in the Medicare supplement plan for the sole purpose of identifying the company responsible for the calls.

45.    With the permission of a family member Plaintiff knows has Medicare, Plaintiff asked the individual if he can borrow their Medicare information for the sole purpose of identifying the company responsible for the calls. Plaintiff did not borrow the individuals Medicare information to gain any additional Medicare benefits or to perform any Medicare fraud that would violate any laws or cause the US government any financial loss.

46.    Jewels then advised Plaintiff she would be transferring him to a licensed "Medicare specialist" that can will cover all of the options available to Plaintiff.

47.    Plaintiff was then transferred to a representative named Daniel from Defendant AIG who answered the call by falsely identifying the company he was with "Medigap enrollment center."

48.    Before Jewels transferred the call to Daniel, Jewels stated to Daniel,

"Yes, hi sir I have David on the line he's looking for Medicare coverage David you're in great hands I'm getting off the line now thank you."

49.    Daniel accepted the transfer from Jewels which confirmed Defendant AIG hires telemarketers to call consumers *en mass* using an ATDS without prior express written consent of the called party soliciting Medicare supplement plans on behalf of Defendant AIG.

50.    Daniel stated to Plaintiff,

"Here at the Medigap enrollment center we are licensed and contracted with all the major A-rated carriers my job here today is to help you understand your options help you find the best Medicare plan for the best price and to assist you through the enrollment process."

51.     Daniel asked Plaintiff if he had Medicare parts A and B along with other qualifying questions.

52.     Daniel solicited Plaintiff for a Medicare plan from Mutual of Omaha and advised Plaintiff the monthly premium would be $148.67 with a one-time enrollment fee of $50.

53.     Plaintiff asked Daniel who his company was, and Daniel stated,

"We're AIG we're a nationwide brokerage we work with all the major A rated carriers to find you the most affordable route to getting one hundred percent coverage."

54.     If Plaintiff would have agreed to the Medicare plan Daniel solicited to Plaintiff, it would benefit Defendant AIG financially.

55.     Plaintiff asked Daniel for Defendant AIG's website and Daniel advised Plaintiff to google their customer service phone number (855) 208-1899 which routed Plaintiff to Defendant AIG's Better Business Bureau page which Daniel confirmed and acknowledged was them. *See Exhibit B.*

56.     Defendant AIG's BBB page revealed the true identity of company responsible for the calls.

57.     Daniel advised Plaintiff he was going to transfer him to the "compliance and verification" team.

58.     Plaintiff was then transferred to another representative from Defendant AIG named Paula.

59.     Paula advised Plaintiff her job was to verify everything he went over with Daniel to make sure it's correct before sending it over to Mutual of Omaha.

60.     Paula placed Plaintiff on hold and the call dropped.

61.     Paula then called Plaintiff at least (3) times and was aggressively asking Plaintiff to complete the verification process so Defendant AIG can submit the application to Mutual of Omaha.

62.    Plaintiff became annoyed and irritated and advised Paula to cancel the application and to stop calling him.

63.    Despite Plaintiff's request to stop being called, Plaintiff received another call the next day from a representative from Defendant AIG named Camille.

64.    Camille advised Plaintiff she was calling back to complete the verification process with Plaintiff.

65.    Plaintiff advised Camille he already advised Paula he was not interested and to stop calling.

66.    Plaintiff has never been a customer of Defendant AIG.

67.    Plaintiff did not provide his prior express written consent to Defendant AIG to receive any of the alleged calls.

68.    Defendant AIG's telemarketers on three occasions used a local area code (915) where Plaintiff resides to trick him into thinking the call was local.

69.    Table A below displays the calls made to Plaintiff on behalf of Defendant AIG.

Table A:

| **Number** | **Date** | **Time** | **Caller ID** | **Notes** |
|:---:|:---:|:---:|:---:|:---|
| 1. | 04/25/2022 | 11:14 AM | 915-634-3753 | Telemarketer Jewels calling soliciting Medicare supplement plans. Call dropped. |
| 2. | 04/26/2022 | 11:24 AM | 915-226-0716 | Telemarketer Jewels calling soliciting Medicare supplement plans. Call dropped. |

| 3. | 04/26/2022 | 3:15 PM | 915-933-8328 | Telemarketer Jewels calling soliciting Medicare supplement plans. Transferred to Daniel, and Paula from AIG. |
| 4. | 04/26/2022 | 4:15 PM | 954-703-1758 | Paula calling to complete verification call dropped. |
| 5. | 04/26/2022 | 4:16 PM | 954-703-1758 | Paula calling to complete verification told her I would call back if I wanted to proceed. |
| 6. | 04/26/2022 | 4:26 PM | 954-703-1758 | Paula calling to complete verification told her to just cancel and stop calling. |
| 7. | 04/27/2022 | 8:47 AM | 954-360-3088 | Camille calling to complete verification advised her I already told Paula to cancel and stop calling. |

70.    Defendant AIG employ outrageous, aggressive, and illegal sales techniques that violate multiple federal laws and state consumer statutes.

71.    Defendant AIG is not registered pursuant to § 302.101 of the Texas Business & Commerce Code to provide telephone solicitations. The https://direct.sos.state.tx.us/telephone/telephonesearch.asp website ("Texas Registration Database") does not contain Defendant AIG's registration.

72.    Defendant AIG does not qualify for an exemption under § 302.053.

73.    No emergency necessitated none of the alleged phone calls.

74.    Each and every call was placed while knowingly ignoring the national do-not-call

registry.

75.     Each and every call was placed without training their telemarketers/representatives on the use of an internal do-not-call policy

76.     Defendant AIG never sent Mr. Salaiz any do-not-call policy.

77.     Plaintiff sent an internal do-not-call policy request to Defendant AIG to support@aighealthins.com on February 22, 2023, which is an email listed in the privacy policy in their website they own and control https://www.aighealthins.com.

78.     Plaintiff has limited data storage capacity on his cellular telephone. Incoming telemarketing calls consumed part of this capacity.

## THE TEXAS BUSINESS AND COMMERCE CODE 305.053

79.     The Texas Business and Commerce code has an analogous portion that is related to the TCPA and was violated in this case.

80.     The Plaintiff may seek damages under this Texas law for violations of 47 USC 227 or subchapter A and seek $500 in statutory damages or $1500 for willful or knowing damages.

## VIOLATIONS OF THE TEXAS BUSINESS AND COMMERCE CODE § 302.101

81.     The actions of the Defendant violated the Texas Business and Commerce Code 302.101 by placing solicitation phone calls to a Texas resident without having a registration certificate and bond on file with the Texas Secretary of State.

82.     Texas Business and Commerce Code § 302.101 provides a private right of action.  A violation of Chapter 302 "is a false, misleading, or deceptive act or practice under Subchapter E, Chapter 17" and is enforceable as such: "A public or private right or remedy prescribed by Subchapter E, Chapter 17, may be used to enforce [Chapter 302." Tex. Bus. & Com. Code § 302.303.

83.     The use or employment by any person of a false, misleading, or deceptive act or practice" causes "economic damages or damages for mental anguish."  Tex. Bus. & Com. Code § 17.50.

84.     Texas Business and Commerce Code §302.101 states that a person (1) "may not make a telephone solicitation" (a) "from a location in [Texas]" or (b) "to a purchaser located in [Texas]," (2) "unless the [person] holds a registration certificate for the business location from which the telephone solicitation is made."  Tex. Bus. & Com. Code § 302.101(a).

85.     Under Texas Business and Commerce Code § 302.302 Plaintiff is entitled to seek damages of up to $5000 per violation of §302.101.

## INJURY, HARM, DAMAGES, and ACTUAL DAMAGES
## AS A RESULT OF THE CALLS

86.     Defendant AIG's calls harmed the Plaintiff by causing the very harm that Congress sought to prevent—a "nuisance and invasion of privacy."

87.     Defendant AIG's calls harmed the Plaintiff by trespassing upon and interfering with Plaintiff's rights and interests in Plaintiff's cellular telephone.

88.     Defendant AIG's calls harmed the Plaintiff by intruding upon Plaintiff's seclusion.

89.     Plaintiff has been harmed, injured, and damages by the calls including, but not limited to: reduced device storage, reduced data plan usage, anger, frustration, invasion of privacy, and more frequent charging of his cell phone.

## VICARIOUS LIABILITY OF DEFENDANT AIG

90.     Defendant AIG is vicariously liable for the telemarketing calls that generated the lead for Defendant AIG.

91.     The FCC is tasked with promulgating rules and orders related to enforcement of the TCPA. 47 U.S.C. § 227(b)(2).

92.     The FCC has explained that its "rules generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 10 FCC Rcd. 12391, 12397 ¶ 13 (1995).

93.     The FCC reiterated that a company on whose behalf a telephone call is made bears the responsibility for any violations. *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 23 FCC Rcd. 559, 565 ¶ 10 (2008) (recognizing "on behalf of" liability in the context of an autodialed or prerecorded message call sent to a consumer by a third party on another entity's behalf under 47 U.S.C. § 227(b)).

94.     The FCC confirmed this principle in a declaratory ruling holding that sellers such as Post may not avoid liability by outsourcing telemarketing:

> [A]llowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside the United States, as is often the case. Even where third-party telemarketers are identifiable, solvent, and amenable to judgment limiting liability to the telemarketer that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law enforcement agencies) would be required to sue each marketer separately in order to obtain effective relief. As the FTC noted, because sellers may have thousands of independent marketers, suing one or a few of them is unlikely to make a substantive difference for consumer privacy.

*In re DISH Network, LLC*, 28 FCC Rcd. 6574, 6588 ¶ 37 (2013) (footnote omitted) (alteration marks and internal quotation marks omitted).

95.    More specifically, *Dish* held that, even in the absence of evidence of a formal contractual relationship between the seller and the telemarketer, a seller is liable for telemarketing calls if the telemarketer "has apparent (if not actual) authority" to make the calls. *Id.* at 6586 ¶ 34.

96.    The ruling rejected a narrow view of TCPA liability, including the assertion that a seller's liability requires a finding of formal agency and immediate direction and control over the third-party who placed the telemarketing call. *Id.* at 6587 ¶ 36 & n.107.

97.    To the contrary, the FCC—armed with extensive data about robocallers and Americans' complaints about them—determined that vicarious liability is essential to serve the TCPA's remedial purpose of protecting Americans from "unwanted telemarketing invasions." *Id.* at 6587 ¶ 36.

98.    Vicarious liability is important because reputable, traceable, and solvent companies that benefit from illegal telemarketing are "in the best position to monitor and police TCPA compliance by third-party telemarketers." *Id.* at 6588 ¶ 37.

99.    Defendant AIG is legally responsible for ensuring that the telemarketers that make telemarketing calls on its behalf comply with the TCPA when so doing.

100.    Defendant AIG knowingly and actively accepted business that originated through illegal telemarketing.

101.    Defendant AIG knew (or reasonably should have known) that its telemarketers were violating the TCPA on its behalf but failed to take effective steps within AIG's power to force them to cease that conduct.

102.    By hiring a company to make calls on its behalf, Defendant AIG "manifest[ed] assent to another person . . . that the agent shall act on the principal's behalf and subject to the principal's control" as described in the Restatement (Third) of Agency ("Restatement").

14

103.    Moreover, Defendant AIG maintained interim control over the actions of its telemarketers.

104.    For example, Defendant AIG had absolute control over whether, and under what circumstances, it would accept a customer from their telemarketers.

105.    Furthermore, Defendant AIG had day-to-day control over the actions of its telemarketers, including the ability to prohibit them from using an ATDS to contact potential customers of Defendant AIG and the ability to require them to respect the National Do Not Call Registry.

106.    Defendant AIG also gave interim instructions to its telemarketers by providing lead-qualifying instructions and lead volume limits.

107.    Defendant AIG donned its telemarketers with apparent authority to make the calls at issue.

108.    Apparent authority turns on whether a third party believes the principal authorized its agent to act and the belief is "traceable" to a manifestation of the principal. Restatement § 2.03 cmt. c.

109.    "[A]pparent authority can arise in multiple ways, and does *not* require that 'a principal's manifestation must be directed to a specific third party in a communication made directly to that person.'" *Dish*, 28 FCC Rcd. at 6586 ¶ 34 n.102 (quoting Restatement § 2.03 cmt. c).

110.    A principal may make a manifestation "by directing an agent to make statements to third parties or directing or designating an agent to perform acts or conduct negotiations, placing an agent in a position within an organization, or placing an agent in charge of a transaction or situation." Restatement § 2.03 cmt. c.

111.    Defendant AIG is the liable party as the direct beneficiary of the illegal telemarketing calls as it stood to gain Plaintiff as a customer when Defendant AIG representatives solicited

Plaintiff for additional Medicare plans.

## THE PLAINTIFF'S CELL PHONE IS A RESIDENTIAL NUMBER

112.    The calls were to the Plaintiff's cellular phone 9280 which is the Plaintiff's personal cell phone that he uses for personal, family, and household use. The Plaintiff maintains no landline phones at his residence and has not done so for at least 15 years and primarily relies on cellular phone to communicate with friends and family. The Plaintiff also uses his cell phone for navigation purposes, sending and receiving emails, timing food when cooking, and sending and receiving text messages. The Plaintiff further has his cell phone registered in his personal name, pays the cell phone from his personal accounts, and the phone is not primarily used for any business purpose.

## CAUSES OF ACTION

### COUNT ONE:
**(Violations of the TCPA, 47 U.S.C. § 227(b)(1)(A)(iii), by Automated Telemarketing Without Prior Express Written Consent)**

113.    Plaintiff realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

114.    Defendant and/or their telemarketers or agents violated the TCPA, 47 U.S.C. § 227(b)(1)(A)(iii), at least three (3) times by placing non-emergency telemarketing calls to Plaintiff's cellular telephone number using an ATDS without prior express written consent.

115.    Plaintiff was statutorily damaged at three (3) times under 47 U.S.C. § 227(b)(3)(B) by Defendant by the telephone calls described above, in the amount of $500.00 per call.

116.    Plaintiff was further statutorily damaged because Defendant willfully or knowingly violated this subsection of the TCPA. Plaintiff requests that the court treble the damage amount

to $1,500.00 as permitted under U.S.C. § 227(b)(3)(C) for each and every willful and/or knowing violation.

117.    Plaintiff is also entitled to and does seek an injunction prohibiting Defendant and their affiliates and agents from violating the TCPA, 47 U.S.C. § 227(b)(1)(A)(iii), by placing non-emergency telemarketing calls to any cellular telephone number using an ATDS without prior express written consent.

## COUNT TWO:

### (Violation of the TCPA "Sales Call/DNC" Prohibition, 47 U.S.C. 227(c), and 47 C.F.R. § 64.1200(C))

118.    Plaintiff realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

119.    Defendant called Plaintiff's private residential telephone number which was successfully registered on the National Do-Not-Call Registry more than thirty-one (31) days prior to the calls for the purposes of commercial solicitation, in violation of 47 U.S.C. § 227(c)(3)(F), and 47 C.F.R. § 64.1200(c)(2).

120.    Plaintiff was statutorily damaged at least seven (7) times under 47 U.S.C. § 227(c)(3)(F) by the Defendant by the telemarketing calls described above, in the amount of $500.00 per call.

121.    Plaintiff was further statutorily damaged because Defendant willfully and/ or knowingly violated this subsection of the TCPA. Plaintiff requests that the court treble the damage amount as permitted under U.S.C. § 227(c)(5) for each and every willful and/or knowing violation.

122.    Plaintiff is entitled to an award up to $1,500 in damages for each knowing or willful violation of 47 U.S.C. § 227(c)(3)(F).

## COUNT THREE:

**Telemarketing Without Mandated Safeguards, 47 C.F.R. § 64.1200(d)**

123.    Plaintiff incorporates the forgoing allegations as if fully set forth herein.

124.    The foregoing acts and omissions of the Defendant and/or their telemarketers or agents constitute multiple violations of FCC regulations by making telemarketing solicitations despite lacking the following:

      a.    A written policy, available upon demand, for maintaining a do-not-call list, in violation of 47 C.F.R. § 64.1200(d)(1)[2];

      b.    Training for the individuals involved in the telemarketing on the existence of and use of a do-not-call list, in violation of 47 C.F.R. § 64.1200(d)(2)[3]; and,

      c.    In the solicitations, the name of the individual caller and the name of the person or entity on whose behalf the call is being made, in violation of 47 C.F.R. § 64.1200(d)(4).[4]

125.    Plaintiff is entitled to an award of at least $500 in damages for each such violation. 47 U.S.C. § 227(c)(5)(B).

126.    Plaintiff is entitled to an award of up to $1,500 in damages for each such knowing or willful violation. 47 U.S.C. § 227(c)(5).

## COUNT FOUR

### (Violations of The Texas Business and Commerce Code 305.053)

127.    Plaintiff incorporates the foregoing allegations as if set forth herein.

---

[2] *See id.* at 425 (codifying a June 26, 2003 FCC order).
[3] *See id.* at 425 (codifying a June 26, 2003 FCC order).
[4] *See id.* at 425 (codifying a June 26, 2003 FCC order

128.    The foregoing acts and omissions of Defendant or agents constitute multiple violations of the **Texas Business and Commerce Code 305.053,** by making non-emergency telemarketing calls to Plaintiff's cellular telephone number without his prior express written consent in violation of 47 U.S.C. § 227 et seq. The Defendant violated 47 U.S.C. § 227(d) and 47 U.S.C. § 227(d)(3) and 47 U.S.C. § 227(e) by using an ATDS that does not comply with the technical and procedural standards under this subsection.

129.    Plaintiff seeks for himself an award of at least $500.00 in damages for each such violation. **Texas Business and Commerce Code 305.053(b).**

130.    Plaintiff seeks for himself an award of up to $1,500.00 in damages for each such knowing or willful violation. **Texas Business and Commerce Code 305.053**(c).

**COUNT FIVE**

**(Violations of Texas Business and Commerce Code 302.101)**
**Failure to obtain a Telephone Solicitation Registration Certificate**

131.    Plaintiff incorporates and realleges, as though fully set forth herein, each of the paragraphs above.

132.    Defendant made at least seven (7) solicitation sales calls to Plaintiff without having a valid telephone solicitation as required under Tex. Bus. Com. Code 302.101.

133.    As a result of Defendant's violations of Tex. Bus. and Com. Code 302.101 Plaintiff may seek damages of up to $5,000 for each violation. Tex. Bus. and Com. Code 302.302(a).

134.    As a result of Defendant's violations of Tex. Bus. and Com. Code 302.101 Plaintiff may seek all reasonable costs of prosecuting this action, including court costs, deposition costs, and witness fees.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Erik Salaiz prays for judgment against the Defendant jointly and severally as follows:

A.    Leave to amend this Complaint to name additional DOESs as they are identified and to conform to the evidence presented at trial;

B.    A declaration that actions complained of herein by Defendant violates the TCPA and Texas state law;

C.    An injunction enjoining Defendant and their affiliates and agents from engaging in the unlawful conduct set forth herein;

D.    An award of $1500 per call in statutory damages arising from the TCPA §227(b) intentional violations jointly and severally against the corporation for three calls.

E.    An award of $1500 per call in statutory damages arising from the TCPA §227(c) intentional violations jointly and severally against the corporation for seven calls.

F.    An award of $1,500 in statutory damages arising from violations of the Texas Business and Commerce code 305.053 intentional violations jointly and severally against the corporations for seven calls.

G.    An award of $5,000 in statutory damages arising from violations of the Texas Business and Commerce code 302.101 intentional violations jointly and severally against the corporations for seven calls.

H.    An award to Mr. Salaiz of damages, as allowed by law under the TCPA and Texas state law;

I.    An award to Mr. Salaiz of interest, costs, and attorneys' fees, as allowed by law and equity

J.    Such further relief as the Court deems necessary, just, and proper.

March 3, 2023,                              Respectfully submitted,


Erik Salaiz
Plaintiff, Pro Se
319 Valley Fair Way
El Paso, Texas 79907
915-252-9280
Salaiz.ep@gmail.com